IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

HUGH MAURICE ALLEN WADE, #332839 *
        Plaintiff,
    v.                                     *    CIVIL ACTION NO. AW-09-1985

DR. ERWIN ALDANA, et al.       *
        Defendants.
                                       ***

## **MEMORANDUM**

I.    *Background*

This 42 U.S.C. § 1983 action for damages was received for filing on July 28, 2009. Plaintiff, who was at all relevant times confined in the Maryland Division of Correction at the Roxbury Correctional Institution ("RCI"), sues three prison physicians. He states that he was diagnosed with multiple myeloma in 2008 while a patient at the University of Maryland Cancer Center ("UMCC"). Plaintiff avers that a chemotherapy treatment that could be administered in prison was recommended and UMCC doctors prescribed Revlimid, an immunomodulatory agent.[1] ECF No. 1. Plaintiff states that the Revlimid treatment requires that registration, enrollment, agreements, and surveys be completed by both medical staff and patient. He alleges that the medication is to be administered in 21-day cycles (with 7 days off) and must be periodically reordered. He complains that Revlimid prescriptions were not timely renewed, causing treatment cycles to be missed in May and June of 2009. Plaintiff also asserts that he has not been seen for his monthly chronic care clinic ("CCC") evaluations and that he fears that he will not receive the Revlimid because of the cost which he states is $8,500.00 per cycle. *Id*.

---

        [1]     According to Plaintiff the Revlimid is a new anti-cancer drug that suppresses both the malignant immunoglobulin-producing plasma cells in the bone marrow and an abnormal monoclonal protein in the bloodstream.

In a supplemental Complaint filed on September 15, 2009, Plaintiff claims that the failure to provide the medication resulted in his experiencing bone pain, particularly in the lower spine and shoulder, fatigue, mental anguish and depression. ECF No. 7. He additionally complains that Oxycontin, which was originally prescribed for his pain beginning in 2008, ran out on or around September 3, 2009, and he was initially informed that a request to refill the prescription had been denied. It later appeared that there was a discrepancy involving the ordering of the medication and that in lieu of the Oxycontin he instead received Nubain, which he used sparingly as it caused him headaches. He complains that he endured "excruciating pain" due to the absence of the Oxycontin for six days. Plaintiff accuses Defendant Tessema of deliberate indifference in that he could have ordered the Oxycontin at a local pharmacy, but instead decided to wait until the discrepancy with the prison pharmacy contractor was resolved. He claims that problems with ordering and receiving Rivlimid and Oxycontin represent a pattern and practice of deliberate indifference on the part of Defendants.[2] *Id.*

II.  *Dispositive Filings*

---

[2] In a subsequent "Supplement to Petition," filed on December 7, 2009, Plaintiff repeats the allegations set out in his first supplement. He again states that he was prescribed the Oxycontin due to chronic pain in his lower spine and aggravated pain from Kahler's disease or multiple myeloma. ECF No. 15. He asserts that Dr. Navarro prescribed the medication for a 90-day regimen on August 5, 2009, and on or around September 6, 2009, he was informed by a nurse that the Oxycontin prescription had expired. The nurse subsequently told Plaintiff that she had inquired into whether Oxycontin could be filled by an outside pharmacy, but the request was denied. The Oxycontin was to be dispensed on September 9, 2009, but due to a discrepancy in its delivery it did not arrive. Plaintiff complains that the Oxycontin was not dispensed until September 12, 2009, and he had to endure 6 days of "excruciating" pain as the Nubain prescribed for him in lieu of Oxycontin did not provide him any relief, but gave him headaches instead. *Id*.

Defendant Tessema filed a Motion to Dismiss or, in the Alternative, for Summary Judgment which Defendant Navarro filed a Motion to Join. ECF Nos. 12 & 16. Plaintiff filed Oppositions thereto. ECF Nos. 14 & 17. On May 17, 2010, the court denied Defendants Tessema and Navarro's Motion to Dismiss or for Summary Judgment without prejudice and directed Defendants to file supplemental materials.[3] ECF No. 19. Defendants have filed a Supplemental Motion to Dismiss in Support of Renewed Motion to Dismiss or, in the Alternative, for Summary Judgment and a Supplement to the Supplemental Motion. ECF Nos. 22 & 26. Plaintiff has filed Oppositions thereto. ECF Nos. 24 & 25. The case is ready for consideration and may be determined on the briefing. *See* Local Rule 105.6. (D. Md. 2010).

III. *Standard of Review*

> Under the December 10, 2010 revisions to Fed. R. Civ. P. 56(a):
>
> A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

"The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*,

---

[3] The court noted that Defendants Tessema and Navarro did not respond to Plaintiff's supplemental claim that he did not receive his Oxycodone medication for several days in September of 2009 and directed them to supplement the record as to the Oxycontin issue. (ECF No. 19). Defendants were also ordered to respond to Plaintiff's Opposition allegations that (1) physicians at RCI failed to comply with manufacturer protocols in order to obtain the Revlimid and (2) the medical record was incomplete as it did not provide documents from a University of Maryland Medical Center ("UMMC") oncologist and hematologist showing the recommended course of treatment. Finally, the court observed that Plaintiff was to receive a follow-up appointment with an oncologist at the Washington Hospital Center ("WHC") in late 2009. Supplemental materials regarding Plaintiff's continuing care for his multiple myeloma, including all medical evaluations, prescription regimen, and blood test results were to be filed by Defendants.

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The court should "view the evidence in the light most favorable to....the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).  "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [its] pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir. 1988).

The Supreme Court has established that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quoting *Gregg v. Georgia,* 428 U.S. 153, 173,(1976)).  As an inmate sentenced to confinement, Plaintiff is entitled to receive reasonable treatment for serious medical needs.  To establish a claim of an Eighth Amendment violation, he must prove two essential elements.  First, he must satisfy the "objective" component by illustrating a serious medical condition. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992); *Estelle v. Gamble*, 429 U.S. at 105; *Shakka v. Smith*, 71 F.3d 162, 166 (4th Cir. 1995); *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998).  The court finds that Plaintiff, who has multiple myeloma, readily meets the first Eighth Amendment prong.  He must then prove the subjective component of the Eighth Amendment standard by showing deliberate indifference on the part of health care personnel. *See Wilson v. Seiter*, 501 U.S. 294, 303 (1991) (holding that claims alleging inadequate medical care are subject to the "deliberate indifference" standard

4

outlined in *Estelle*, 429 U.S. at 105-06). "[D]eliberate indifference entails something more than mere negligence [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Personnel "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id*. at 837. A defendant cannot be held liable for medical treatment in which they played no role.

IV.     *Analysis*

According to the affidavits and hundreds of pages of medical records filed in this case (ECF Nos. 12, 22, & 26), Plaintiff has a history of multiple myeloma ("MM"), which is a cancer of the plasma cells. The condition can affect the bones, immune system, kidneys, and red blood cell count. Defendants state that Plaintiff's MM is being treated with Revlimid, a drug that works with the bone marrow to stop or slow the growth of the cancerous myeloma cells. As indicated by Plaintiff, Revlimid is taken on a 21-day cycle, with a seven-day rest period. Known side-effects of Revlimid are low platelet count (Thrombocytopenia) and a low white blood cell count (Neutropenia). Defendants state that to obtain Revlimid from the manufacturer, a physician must apply to be the designated provider, complete a survey, and receive an authorization number for the next course of the medication. The manufacturer also requires the patient to participate in a telephone interview. When this entire process is completed, the order for the Revlimid is faxed to the Division of Correction ("DOC") pharmacy contractor, CorrectRx, which obtains the medication directly from the manufacturer and delivers it to the institution for distribution to the inmate.

Defendants affirm that Plaintiff's prescription for a 21-day cycle of Revlimid was re-ordered on March 18, 2009. Plaintiff's 7-day rest period began on April 15, 2009, and ended on April 21, 2000. On April 21, 2009, Dr. Alana renewed Plaintiff's Revlimid prescription and

5

faxed the necessary paperwork required by the manufacturer to CorrectRx. The medication was not available from the pharmacy, however, until April 24, 2009. Plaintiff received the Revlimid that date, three days after the cycle was to restart, and he continued on the 21-day cycle.

Defendants note that on May 13, 2009, Plaintiff's white blood cell (WBC") and platelet counts were below normal levels. He was evaluated by Dr. Navarro that date in the CCC, where he complained of fatigue, weakness, and lightheadedness occurring during the rest periods of his treatment cycles.

Plaintiff's Revlimid prescription cycle was scheduled to resume on May 22, 2009. It did not. On May 27, 2009, Plaintiff came to the RCI dispensary to ask why he was not receiving his medication. According to Defendants, the prescription renewal paperwork was faxed to Dr. Aldana for his signature and then faxed to CorrectRx for ordering from the manufacturer. Defendants claim that Plaintiff's WBC and platelet counts were again found to be below normal on May 27, 2009, an indication that Plaintiff was suffering from the side-effects of the Revlimid.

On June 2, 2009, Dr. Navarro telephoned the manufacturer to determine when the medication would be delivered to CorrectRx. On June 8, 2009, Dr. Navarro noted that Plaintiff's Revlimid had still not been received, despite Dr. Aldana faxing the renewal prescription to CorrectRx the previous week. Dr. Navarro completed another Non-Formulary Drug Request Form and sent the form to CorrectRx to reorder the Revlimid. Plaintiff's blood tests on June 10, 2009, showed that his WBC and platelet counts were below normal. Plaintiff's Revlimid was restarted on June 11, 2009 and ended on June 30, 2009. His WBC and platelet counts taken on Jun 17, 2009 had again dropped.

Plaintiff's next 21-day cycle of Revlimid was to resume on July 8, 2009. Some two weeks later, however, he had not received the medication. Defendants state that the Revlimid was not available from CorrectRx. Physician's Assistant ("P.A.") Crystal Swecker ordered an

oncology consultation for Plaintiff because he complained of increased pain, lethargy, and missed Revlimid cycles. On July 23, 2009, three months after significant problems began with the receipt of the medication, Hagerstown region Health Services Administrator Cheryl Bennett called CorrectRx and spoke to a pharmacy physician about how to expedite the process of receiving Plaintiff's Revlimid during each cycle. Bennett was informed that due to the nature of the medication, a specific provider from Hagerstown must be designated to order the Revlimid from CorrectRx. She noted that she would consult with Dr. Tessema, the Hagerstown Regional Medical Director, as to the ordering of Revlimid.

On August 5, 2009, Dr. Navarro evaluated Plaintiff for his complaints of increased pain and the non-availability of the Revlimid medication. Navarro noted that she had consulted with the CorrectRx pharmacist regarding the dispensing of the drug and the pharmacist advised Navarro to hold off on the administration of the medication and to review the side-effects and adverse reactions from long-term use of the Revlimid, including a decrease in the WBC and platelet counts. In light of the possibility of "Revlimid toxicity," Navarro reduced the Revlimid dosage from 25 mg. to 15 mg. a day for 21 days, and indicated that Plaintiff's blood counts would be monitored.

On August 10, 2009, Plaintiff was seen by an oncologist at the Washington County Hospital ("WCH""), who noted that Plaintiff had "smoldering myeloma"[4] and that it was mandatory at that time to "re-stage"[5] Plaintiff's cancer before making any further decisions about

---

[4] Smoldering myeloma is a slow-growing type of multiple or myeloma plasmacytoma (a rare form of myeloma in which there is only one tumor) that is not causing the symptoms or damage that is common in people with other types of myeloma. *See* http://everydayhealth.com/multiple-myeloma/smoldering-myeloma.aspx. (copy attached)

[5] Defendants state that staging is the process of finding out how much cancer is in the body and where it is located.

his chemotherapy. The blood tests performed at WCH on August 10, 2009, showed below normal but improved WBC and platelet counts.

On August 11, 2009, Plaintiff began to receive his Revlimid medication at the lower dosage prescribed by Dr. Navarro. Navarro filed a consultation request on August 17, 2009, for Plaintiff to be reassessed by the oncologist following receipt of the results of Plaintiff's blood tests. The Revlimid prescription was renewed on September 5, 2009, and he received the medication on September 26, 2009. Plaintiff's Revlimid prescription was renewed on September 25, 2009, and the next 21-day cycle resumed on October 4, 2009.

On October 7, 2009, Plaintiff was evaluated by Dr. Scott Wegner, an oncologist at the John R. March Cancer Center ("JMCC") in Hagerstown, Maryland who found Plaintiff's WBC and platelet counts to be below normal range. Wegner indicated that Plaintiff needed to follow-up for his Revlimid prescription for two months and that he would see Plaintiff in two weeks to determine whether the Revlimid regimen should be continued.

P.A. Swecker evaluated Plaintiff on October 19, 2009 for his complaints of neck pain, sore throat, and headache. Swecker concluded that Plaintiff had otitis media (ear infection) and thrush (oral condition caused by the fungus Candida albicans). On October 20, 2009, Plaintiff's WBC count was normal, while his platelet count was below normal. He received his last Revlimid dosage on October 24, 2009.

Dr. Wegner re-evaluated Plaintiff on October 22, 2009. He concluded that Plaintiff would need more chemotherapy in the future, but recommended discontinuing the Revlimid medication, repeating blood tests in one month, and scheduling a follow-up appointment Wegner concluded that Plaintiff's back pain was not related to his multiple myeloma and he recommended that Plaintiff follow-up with him in one month after the blood tests were completed. In light of this evaluation, the Revlimid was discontinued.

Dr. Wegner evaluated Plaintiff on a regular basis and has recommended that Plaintiff not receive any further chemotherapy treatment with Revlimid. Plaintiff is seen regularly by oncologists at JMCC for evaluation of his MM. On November 19, 2009, he returned to JMCC to have his blood tested for indicators. Dr. Wegner evaluated Plaintiff at JMCC and classified his multiple myeloma as "smoldering." Blood drawn on that day showed a WBC count of 2.4 and a platelet count of 114, 000. In February, March, April of 2010, Plaintiff saw Wegner and underwent blood testing. Dr. Wegner continued to classify the MM as smoldering and found that blood tests distinctive for myeloma were stable. Dr. Wegner found no progression of Plaintiff's disease and no signs of end organ damage.[6] He concluded that Plaintiff did not require any chemotherapy and recommended that Plaintiff receive a follow-up appointment in three months.

Defendants also claim that Plaintiff was referred to a neurosurgeon for his complaints of back, neck, and shoulder pain. Plaintiff refused to sign the consultation form for an April 20, 2010 appointment. Another neurosurgical consultation was requested on May 20, 2010 to evaluate the foraminal stenosis and lumbar disc protrusion noted in Plaintiff's cervical and lumbar spine MRIs.

In response to Plaintiff's supplemental allegations, Defendants assert that Plaintiff receives Oxycontin (Oxycondone Hcl) for his complaints of pain related to his MM and lumbar radiculopathy, with the dosage adjusted periodically, depending on Plaintiff's pronounced subjective pain level. They acknowledge that from September 7 to September 9, 2009, Plaintiff's Oxycontin was not available from the pharmacy contractor, CorrectRx, but was

---

[6] End organs are special structures containing the terminal of a nerve fiber in peripheral tissue, such as muscle, tissue, skin, mucous membrane, or glands.

resumed on September 9, 2009, upon receipt from the pharmacy.[7] On September 9, 2009, Plaintiff complained of increased pain and his Oxycontin was increased to 80 mg. twice a day. Defendants affirm that Plaintiff took the medication for a few days, but stated that he felt it was too strong. The Oxycontin dosage was decreased to 60 mg. twice a day and Plaintiff remains on this dosage. Defendants state that in addition to Oxycontin, Plaintiff received Toradol and Ultram for pain in January and February of 2009, and, as noted in the Supplemental Complaint, Plaintiff received Nubain or Tylenol #3 with Codeine as an alternative substitution between refills of his Oxycontin and received four dosages of Nubain to control his pain while the Oxycontin was unavailable. They argue that insofar as Plaintiff complains that Nubain exacerbates the symptoms of withdrawal from Oxycontin, such is not case. Nubain, a synthetic opioid, can prevent withdrawal from other opioids such as Oxycontin. Defendants claim that there is nothing in the medical records which shows that Plaintiff complained of any symptoms of withdrawal from Oxycontin in September, 2009.

To respond to Plaintiff's Opposition statement that he was treated at the University of Maryland Cancer Center ("UMCC") in 2008 and 2009 and his complaints that (1) Dr. Wegner did not subscribe to that treatment and discontinued the Revlimid without consulting UMCC oncologists and (2) he did not receive Revlimid for the 21-day cycle in April, 2009, Defendants have filed further supplemental materials. They state that Plaintiff did in fact receive the Revlimid as prescribed from March 25 through April 14, 2009, from April 24, 2009 through May 14, 2009, and from June 11 through July 1, 2009. Defendants acknowledge that there was a period of time that Plaintiff did not receive the Revlimid because the medication was not

---

[7] Defendants subsequently affirm that the Oxycontin was not received for distribution until September 10, 2009.

available from CorrectRx. The medication was restarted on August 11, 2009, and administered through August 30, 2009.

Defendants state that Dr. Wegner evaluated Plaintiff in Hagerstown noting that he would need additional chemotherapy in the future, but deciding to discontinue the Revlimid and to conduct blood testing and follow-up evaluations to monitor Plaintiff's WBC and platelets. Defendants now bring forward Plaintiff's medical record from UMMC which shows that he was evaluated and treated at UMMC from April 30, 2008 to June 20, 2008. Plaintiff underwent testing for pancytopeia[8] and he was in due course diagnosed with smoldering MM. The hematologist/oncologist at UMMC, Dr. Amy Kimball, recommended multiple myeloma labs every six weeks and that Plaintiff receives Revlimid 25 mg. daily, which is the dosage that was continued by Dr. Wenger at JMCC. Defendants state that Plaintiff's oncology care and treatment was transferred to JMCC and he is seen regularly for his MM.

There is no doubt that inmates in the Maryland Division ("DOC") have serious medical needs. Like the general population, inmates entering DOC facilities suffer from diseases such as degenerative joint disease, cancer, hypertension, and diabetes. Upon entering the prison environment, inmates may experience the full ambit of medical problems, ranging from the routine to the life-threatening. It is arguable that many serious health disorders, as well as risk factors for communicable diseases, are disproportionately represented in the prison population due to prior lifestyles, economic factors, and access to medical care. These problems are exacerbated by the nature of the prison environment and its aging prison population.

The court has examined the Complaint and all arguments, exhibits, and affidavits presented in the responsive papers. The record shows that Plaintiff was frequently monitored,

---

[8] Pancytopenia is a decrease in the number of all types of blood cells, including WBC and blood platelets.

evaluated, and treated for his MM by on-and off-site medical staff, including an oncologist at JMCC. Further, when ordered by the physician, his Revlimid medication regimen was routinely provided to him, with the exception of one or two particular cycles. There is no showing that Defendants' alleged failure to adhere to the Revlimid protocols required by its manufacture occurred as a pattern or practice of health care staff or otherwise or was made due to cost factors. Further, there is no indication that any delays caused Plaintiff injury. Further, Plaintiff's allegation that the oncologist and health care staff in Hagerstown failed to consult with like staff at UMMC with regard to his MM is not an actionable claim. There is no showing the the MM care he received at RCI and at JMCC in 2009 and 2010 is wholly different from prior medical recommendations. Plaintiff's MM remains smoldering and stable and his WBC and platelet counts continue to be monitored by physicians. Plaintiff may disagree with the course of treatment for his MM, but this does not comprise an Eighth Amendment deprivation.

With regard to Plaintiff's allegation regarding his receipt of Oxycontin, the court reaches a similar conclusion. While there may have been occasional problems with delays in the receipt of this opiate, Defendants have shown that they took stop gap measures to give Plaintiff other pain medications, including the synthetic opiate Nubain, to provide him temporary relief until the Oxycontin was received. In any event, there is no evidence that the delays constituted a deliberate pattern or practice of the denial of medical care.

V. *Conclusion*

For the aforementioned reasons, Defendants' supplemental dispositive motion, construed as a supplemental motion for summary judgment shall be granted.[9]  A separate Order follows.


Date:  February 8, 2011                              _____/s/_____
                                                     Alexander Williams, Jr.
                                                     United States District Judge

---

[9]  In light of the failure to find an Eighth Amendment deprivation, the Complaint against Defendant Aldana shall be dismissed.